**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

KEVIN KOVACIC and
TAMMY KOVACIC,

    **Plaintiffs,**

  **v.**         **Case No. 23-C-642**

MARY RUECHEL, et al.,

    **Defendants.**

**DECISION AND ORDER GRANTING IN PART DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT AND**
**DENYING MOTION FOR SANCTIONS**

  Plaintiffs Kevin and Tammy Kovacic brought this 42 U.S.C. § 1983 action for damages against fifteen law enforcement officers and the two counties and city that employed them, Oconto and Forest Counties and the City of Crandon, for allegedly violating Plaintiffs' rights.  At some point during this litigation, Tammy Kovacic changed her legal name to Tammy Lively, Dkt. No. 112 at 1 n.1, but for simplicity and consistency the court will refer to her as "Ms. Kovacic."  In any event, the case arises out of the stop of a vehicle in which Plaintiffs were lawfully transporting legal hemp to a customer in northeast Wisconsin in the course of Ms. Kovacic's business, Wautoma Cannabis Queen, LLC.  When a drug detection dog alerted on the car and the hemp tested positive for the presence of THC, law enforcement officers seized the hemp, arrested Mr. Kovacic, and booked him into the Oconto County Jail.  By the time the hemp was tested and found to be lawful, it had lost all value.

  In their second amended complaint, Plaintiffs assert the following claims: (1) false arrest of Mr. Kovacic in violation of the Fourth Amendment; (2) denial of adequate medical care for Mr.

Kovacic while detained at the Oconto County Jail in violation of the Fourth Amendment; (3) unreasonable seizure of hemp in violation of Ms. Kovacic's rights under the Fourth and Fourteenth Amendments; (4) failure of the governmental employers to properly train their officers; and (5) indemnification of the officers under state law. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

On May 15, 2025, the Oconto County Defendants and the Forest County Defendants filed a motion for summary judgment. That same day, the City of Crandon Defendants filed a separate motion for summary judgment. On June 11, 2025, the Oconto County Defendants and the Forest County Defendants filed a motion for sanctions under Federal Rule of Civil Procedure 11. For the following reasons, the motions for summary judgment will be granted as to all Defendants with the exception of Oconto County and the motion for sanctions will be denied.

## PRELIMINARY MATTERS

Before recounting the factual background and addressing the parties' substantive arguments, the court must address certain preliminary matters. Plaintiffs have, in a footnote in their response brief, stated that they voluntarily dismiss their claim against seven of the defendant officers who were alleged to have violated Mr. Kovacic's Fourth Amendment right to adequate medical treatment while at the Oconto County Jail. *See* Dkt. No. 114 at 2 n.1. The procedural propriety of this move aside, *see Taylor v. Brown*, 787 F.3d 851, 858 (7th Cir. 2015) (stating that amendment of complaint under Fed. R. Civ. P. 15(a), as opposed to voluntary dismissal under Fed. R. Civ. P. 41(a), is the proper vehicle for dismissing a single claim in a multi-claim case), the court is satisfied that these defendants are entitled to summary judgment on Plaintiffs' inadequate medical care claim based on Plaintiffs' failure to respond to Defendants' arguments regarding this claim. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an

argument . . . results in waiver."). Accordingly, summary judgment is granted and Plaintiff Kevin Kovacic's claims against Oconto County Jail Administrator Carol Kopp; Jail Lieutenant Mary Ruechel; Deputies Tony Mossakowski and Jess Keplinger; Correctional Officers Dave Rosenfeldt and Scott Buhrandt; and Jordan Dycus, a legal assistant for the Oconto County District Attorney, are dismissed.

Likewise, Plaintiffs failed to respond to Defendants' arguments concerning Ms. Kovacic's Fourteenth Amendment procedural due process claim. Accordingly, Officer Steve Ashbeck, Lieutenant Tom Robinson, Detective Sergeant Darrell Wilson, Deputy Michael Short, Deputy Kevin Christensen, Lieutenant Eric Thomson, Deputy Nicholas School, and Deputy Tony Crum are entitled to summary judgment on that claim. What remains before the court, then, are Plaintiffs' Fourth Amendment arrest and seizure claims, as well as their *Monell* and indemnification claims.

## FACTUAL BACKGROUND

On May 20, 2022, the Northeast Tri-County Drug Enforcement Group was conducting a multi-jurisdictional criminal interdiction in Oconto County, Wisconsin, that targeted drug trafficking. Dkt. No. 113, ¶ 1. City of Crandon Police Officer Steve Ashbeck and Forest County Sheriff's Office Lieutenant Tom Robinson were on duty together as part of the interdiction and were patrolling the Township of Little River in Lieutenant Robinson's squad car. *Id.* ¶ 6. The officers noticed a white Cadillac travelling northbound on US Highway 41. *Id.* ¶ 18. Officer Ashbeck believed the Cadillac's driver-side and rear passenger windows were illegally tinted. Dkt. No. 111, ¶ 7. Lieutenant Robinson activated his squad car's emergency lights and initiated a traffic stop of the vehicle. *Id.*, ¶ 8.

3

Mr. Kovacic drove the Cadillac, Ms. Kovacic was in the passenger seat, and there were four small dogs in the back of the vehicle barking and jumping around. *Id.*, ¶ 10; Dkt. No. 113, ¶ 23. Officer Ashbeck approached the vehicle from the passenger side and asked Mr. Kovacic through the passenger window to step outside the vehicle. *Id.* ¶ 9; Dkt. No. 94-2 at 00:38. Mr. Kovacic complied and met Officer Ashbeck near the rear bumper of the Cadillac. Dkt. No. 94-2 at 00:55. Officer Ashbeck explained to Mr. Kovacic that the reason for the stop was the Cadillac's window tint. *Id.* at 00:56–00:58. Mr. Kovacic immediately protested, arguing that the officers had no right to pull him over because the window tint was legal. *Id.* at 00:59–01:10. Mr. Kovacic then told Officer Ashbeck, "I'm suing your ass." *Id.* at 01:12.

Officer Ashbeck proceeded to test the driver-side windows with a tint meter. Dkt. No. 111, ¶ 12. Under Wisconsin law, the tinting of a vehicle's windows is permitted if the windows are "tinted by the application of tinting film to the inside of the glazing provided that the combination of the glazing and tinting film permits passage through the windows of at least 50% of the visible light striking the windows." Wis. Admin. Code § Trans. 305.32(4)(b)2. As Officer Ashbeck performed the test, Mr. Kovacic became increasingly upset. He exclaimed, "This is bullshit!" and "He's a f*****g liar!" (referring to Officer Ashbeck). Dkt. No. 94-2 at 01:23–01:30. Mr. Kovacic then turned to Lieutenant Robinson and remarked, "Ha! You're f****d! You're driving like a lunatic. Why did you run me off the road? Why? Why did you f****n' run me off the road?" *Id.* at 01:40–01:50. The tint meter—which determines the percentage of light that passes through the window—returned a reading of 47% on the front driver-side window and 32% on the rear driver-side window. Dkt. No. 111, ¶ 12. Officer Ashbeck therefore returned to Lieutenant Robinson's squad car to issue Mr. Kovacic a citation for illegal window tint. *Id.* ¶ 13. While he

4

was issuing the citation, Detective Sergeant Darrell Wilson of the Forest County Sheriff's Department, arrived on scene. *Id.* ¶ 15; Dkt. No. 113, ¶ 7.

Sergeant Wilson was on duty as a K-9 patrol officer and was accompanied by his K-9 Partner, Thunder. Dkt. No. 113, ¶¶ 7–8. Thunder is trained and certified in narcotic detection, including the detection of marijuana. *Id.* ¶ 10. Sergeant Wilson approached the Cadillac to speak with Mr. Kovacic, who was back in the Cadillac's driver's seat. *Id.* ¶ 33. Sergeant Wilson introduced himself as a narcotics dog handler and asked Mr. Kovacic if he had anything illegal in the vehicle. *Id.* ¶ 36; Dkt. No. 98-2 at 00:27. Mr. Kovacic explained that Plaintiffs are hemp growers and that they had several packages of hemp in the car. Dkt. No. 98-2 at 00:30–00:40. Plaintiffs each had active hemp producer licenses issued by the United States Department of Agriculture (USDA) at the time, and although Ms. Kovacic was in possession of her USDA Hemp Producer License, the officers apparently never asked to see it. Dkt. No. 110, ¶¶ 7–8; Dkt. No. 109, ¶ 4.

After a short discussion between Sergeant Wilson and Mr. Kovacic about a prior engagement with law enforcement, Sergeant Wilson asked Mr. Kovacic to step out of the vehicle, but Mr. Kovacic refused. Dkt. No. 98-2 at 00:50–01:15. Sergeant Wilson again asked if there was anything illegal in the car, and Plaintiffs responded that there was not. *Id.* at 01:37–01:43. He then advised Mr. Kovacic to roll up the window and stay in the car. *Id.* at 01:45–01:47. Sergeant Wilson performed a perimeter search of the Cadillac with Thunder while Officer Ashbeck and Lieutenant Robinson continued preparing the paperwork for the traffic citation. *See id.* at 02:25–02:46; Dkt. No. 113, ¶¶ 40–41. Thunder alerted to the back left corner of the vehicle. Dkt. No. 113, ¶¶ 42–43.

Following Thunder's alert, Sergeant Wilson explained to Mr. Kovacic that Thunder had alerted for the presence of the odor of illegal narcotics. *Id.*, ¶ 45. The deputies requested that Plaintiffs remove their dogs from the vehicle for safety reasons. *Id.* ¶ 46. Sergeant Wilson conducted a pat down search of Mr. Kovacic after Mr. Kovacic consented to the search. Dkt. No. 98-2 at 04:19–04:55. Lieutenant Robinson, Sergeant Wilson, and Forest County Sheriff's Office Deputy Michael Short then conducted a search of the vehicle. *Id.* at 10:50; Dkt. No. 113, ¶ 48. Oconto County Sheriff's Office Lieutenant Eric Thomson and Deputy Nicholas School, who arrived after the Forest County deputies started the search, also assisted with the search. *See* Dkt. No. 113, ¶ 62. Oconto County Sheriff's Office Deputy Kevin Christensen was present during the search but only stood by for officer and citizen security. *Id.* ¶ 77.

While searching the vehicle, Sergeant Wilson noted, "smells like weed in here." Dkt. No. 98-2 at 12:20. Several packages of green, leafy substance appearing to be cannabis were found in the vehicle. Dkt. No. 113, ¶ 49. The packages varied in form. Two looked to be non-commercial vacuum sealed home kitchen food saver bags that contained zip lock baggies of the plant material. *Id.* ¶ 57. There was also loose plant material in an unsealed baggie that was in a disposable Glad Ware-type container. *Id.* ¶ 58. The two vacuum sealed bags and the container had affixed to them a Wisconsin Department of Agriculture, Trade, and Consumer Protection "Fit for Commerce" label dated August 13, 2021. *Id.* ¶ 59. The "Fit for Commerce" labels were print outs from a home printer and certified that the cannabis was hemp and a sample had been tested at below 0.3% total delta-9 tetrohydrocannabinol on August 10, 2021. *Id.*; *see also* Dkt. No. 98-2 at 11:48–11:51.

The search also revealed a used prescription pill bottle holding four hand-rolled cigarettes or joints containing what appeared to be cannabis, rolling papers, an improvised device for smoking marijuana, empty police evidence bags, and a can of law-enforcement-grade pepper

spray. Dkt. No. 113, ¶¶ 50–51, 66, 69. Lieutenant Robinson tested some of the plant material from one of the hand-rolled cigarettes using a Nark II Duqenois Levine Reagent Test Kit. *Id.* ¶ 54. The plant material tested positive for THC. *Id.* ¶ 55. After the search, the officers learned that Mr. Kovacic had other "open cases," though it is unclear whether the officers had knowledge of the nature or status of those cases. *See* Dkt. No. 98-2 at 21:00–21:15.

Mr. Kovacic repeatedly told the officers that the packages and hand-rolled cigarettes contained hemp, which they were legally permitted to grow and possess. Plaintiffs both attempted to assuage the officers' specific concerns over the packaging and labeling of the substance to no avail. *See* Dkt. No. 94-3 at 04:27–06:36. Ultimately, Lieutenant Thomson took possession of the packages containing cannabis, the prescription pill bottle containing four hand-rolled cigarettes, the rolling papers, and the marijuana smoking device. Dkt. No. 113, ¶ 69. Lieutenant Thomson and Deputy School made a joint decision to place Mr. Kovacic under arrest for possession with intent to deliver THC. *Id.* ¶ 78. Officer Ashbeck handcuffed Mr. Kovacic and escorted him to Sergeant Wilson's squad car. *Id.* ¶ 74; Dkt. No. 118, ¶ 1. Sergeant Wilson and Forest County Sheriff's Office Deputy Tony Crum transported Mr. Kovacic to the Oconto County Jail. Dkt. No. 113, ¶ 75. Mr. Kovacic was booked into the Oconto County Jail that day, which was a Friday, and released the following Monday. Ms. Kovacic was not arrested. *Id.* ¶ 79.

In the meantime, Lieutenant Thomson made arrangements for the plant substance seized from Plaintiffs' car to be tested. Lieutenant Thomson states that law enforcement had been informed that the Wisconsin State Crime Laboratory could not and would not determine the concentration of THC in suspected marijuana versus hemp as of April 2022 because the 4-AP test developed to make such a determination had not yet been included into its analytical scheme. Dkt. 97, ¶ 16. On May 25, 2022, some five days after Mr. Kovacic's arrest, Lieutenant Thomson

contacted Accelerated Labs, a private laboratory, about testing samples of the cannabis seized from Plaintiffs' vehicle. He was advised that Accelerated Labs would not be able to perform the testing until September 15, 2022. Lieutenant Thomson received the test results from Accelerated Labs, which apparently confirmed Plaintiffs' claims that the substance was in fact hemp, on November 7, 2022. On December 16, 2022, Lieutenant Thomson received word that the District Attorney's Office would not be charging Mr. Kovacic with drug related crimes and the hemp could be released. Ms. Kovacic retrieved the hemp on February 15, 2023. *Id.*, ¶¶ 22–29. By that time, Plaintiffs allege the hemp had lost all value and could no longer be sold to any purchaser. Dkt. No. 68, ¶ 49. This lawsuit followed.

## ANALYSIS

### A.      Motions for Summary Judgment

Summary judgment is proper when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the

8

videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007).  Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

### 1.     Fourth Amendment Claims

Defendants seek summary judgment on Plaintiffs' Fourth Amendment claims.   In their brief in opposition to Defendants' motions for summary judgment, Plaintiffs assert that Defendants violated their Fourth Amendment rights in three ways.  First, Plaintiffs argue that Officer Ashbeck and Lieutenant Robinson did not have a lawful basis to initiate the traffic stop and unlawfully extended it.   Second, Plaintiffs argue that Officer Ashbeck, Lieutenant Robinson, Detective Sergeant Wilson, Deputy Short, Lieutenant Thomson, Deputy School, Deputy Crum, and Deputy Christensen either falsely arrested Mr. Kovacic and illegally seized Ms. Kovacic's hemp, or failed to intervene so as to prevent the unlawful arrest and illegal seizure.   Alternatively, Defendants argue that the individual defendants are immune from personal liability under the qualified immunity doctrine, and thus their governmental employers have no duty to indemnify them under state law.  The court will address each in turn.

### a. Reasonable Suspicion for and Duration of Initial Stop

As an initial matter, Defendants argue that Plaintiffs did not adequately plead in the second amended complaint that the stop was unlawfully undertaken and unlawfully prolonged.   In opposing summary judgment, a plaintiff cannot advance a theory of his claim that was not pleaded in his complaint. *See Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 806 (7th Cir. 2011) (upholding the district court's rejection of a new theory of discrimination raised for the first time in opposition to summary judgment).  This only makes sense, for "post-*Twombly*, a complaint must describe a

claim 'in sufficient detail to give the defendant fair notice of what the claim is and the ground upon which it rests.'" *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)). Here, Plaintiffs did not allege in the second amended complaint that the initial traffic stop or its length was unconstitutional. Indeed, there is no reference to the traffic stop, *see* 2d Am. Compl. ¶ 24, and certainly not enough factual information to have put Defendants on fair notice that the constitutionality of the stop or its length was being challenged. Since no such claim was asserted in the second amended complaint, there is no need to address Plaintiffs' argument further.

### b. Probable Cause for Arrest of Mr. Kovacic and Seizure of Hemp

In Count One of their second amended complaint, Plaintiffs claim that Oconto County Sheriff Deputy School, who is identified in the reports as the arresting officer, violated Mr. Kovacic's Fourth Amendment rights by taking him into custody without probable cause to arrest. Plaintiffs further claim that Lieutenant Thomson, Sergeant Wilson, and Deputy Christensen of the Oconto County Sheriff's Office; Lieutenant Robinson and Deputies Crum and Short of the Forest County Sheriff's Department; and Officer Ashbeck of the City of Crandon Police Department (collectively, "the individual defendants") violated Mr. Kovacic's rights by participating in the arrest or failing to intervene. 2d Am. Compl. ¶¶ 51–54. In Count Three, Plaintiffs assert that the individual defendants violated Ms. Kovacic's Fourth Amendment rights by illegally seizing her hemp. Defendants argue that probable cause for Mr. Kovacic's arrest and seizure of the hemp clearly existed.

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013) (citation omitted). An officer has probable cause to arrest "if the

10

totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714 (citations omitted); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The inquiry is a "purely objective" one and it does not deal in "hard certainties" but rather "probabilities." *Abbott*, 705 F.3d at 714. It "inherently allows room for reasonable mistakes." *Id.* (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)). Thus, the fact that the plant material later turned out to be hemp is not determinative. The task for the court is to "'examine the events leading up to the arrest' and then determine 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *United States v. Eymann*, 962 F.3d 273, 287 (7th Cir. 2020) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

The test for seizure of property is essentially the same. Although Defendants contend that Mr. Kovacic consented to their seizure of the hemp, the scope of that consent is in dispute. Even so, assuming that the officers were lawfully in a position to observe the property, they had authority to seize it if they had "probable cause to believe that the item is contraband or otherwise linked to criminal activity." *United States v. Cellitti*, 387 F.3d 618, 624 (7th Cir. 2004). Thus, the probable cause question is determinative for both Count One and Count Three. If there was probable cause to believe the hemp was marijuana, both claims fail.

Whether probable cause exists is necessarily a fact-intensive inquiry that does not lend itself to definitive legal rules. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). "On the other hand, if the question of probable cause arises in a damages suit, it is a proper issue for

11

the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Id.* (citing *Llaguno v. Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985) (*en banc*) (plurality opinion). "Probable cause can be found as a matter of law, however, only when the facts permit but one conclusion—that is, 'only when no reasonable jury could find that the officers did not have probable cause.'" *Jones by Jones v. Webb*, 45 F.3d 178, 182 (7th Cir. 1995) (quoting *Maxwell*, 998 F.2d at 434).

Based on well-established law and the undisputed facts of the case, Defendants contend that probable cause for the arrest of Mr. Kovacic and seizure of the hemp clearly existed at the time the arrest and seizure were conducted. As an initial matter, their argument would appear to have merit. It has long been the law in this circuit that "[a]n alert from an adequately trained and reliable dog is sufficient to give rise to a finding of probable cause." *United States v. Bentley*, 795 F.3d 630, 635 (7th Cir. 2015) (citing *United States v. Washburn*, 383 F.3d 638, 643 (7th Cir. 2004)); *see also United States v. Simon*, 937 F.3d 820, 833 (7th Cir. 2019) ("A dog's alert on a car can give probable cause to search the entire car. Indeed, a good dog's alert can provide a rebuttable presumption of probable cause to search."). Plaintiffs do not contest Thunder's reliability or dispute that he alerted on the vehicle. Thus, Defendants argue, the search was lawful. But as noted above, Plaintiffs have not asserted a claim that the search of their vehicle was unlawful. It is the arrest of Mr. Kovacic and the seizure of Ms. Kovacic's hemp that they claim violated their Fourth Amendment rights.

Thunder's alert, Defendants further argue, permitted the officers to search the vehicle without a warrant in accordance with the automobile exception. *See United States v. Devalois*, 128 F.4th 894, 900 (7th Cir. 2025); *see also United States v. Jackson*, 103 F.4th 483, 486 (7th Cir. 2024) (collecting cases). In the course of the search, the officers found multiple packages of

12

cannabis, hand-rolled cigarettes containing cannabis, rolling papers, a homemade smoking device, police evidence bags, and law-enforcement-grade pepper spray. During the search, Detective Sergeant Wilson also noted the vehicle smelled of marijuana. And while the packages of cannabis were affixed with labels identifying the contents as hemp, the labels appeared to have been printed from a home printer and were unlike other certificates the officers had seen, which raised suspicions over their authenticity. In addition, Sergeant Wilson states that he smelled the strong odor of burnt marijuana coming from Mr. Kovacic's person, and the plant material Sergeant Wilson extracted from the hand-rolled cigarettes, or joints, ultimately tested positive for THC using the Nark II Duquenois Levine Reagent test (Nark II test).

Defendants also point to Mr. Kovacic's demeanor as a factor that contributed to their determination that probable cause existed. From the very inception of the stop, Mr. Kovacic was hostile and belligerent, peppering his speech with vulgarities, accusing them of misconduct, and threatening lawsuits. Although Mr. Kovacic's demeanor could certainly have been the product of annoyance and anger at being pulled over for excessive window tint, it was not unreasonable for the officers to believe that his reaction was excessive and an attempt to intimidate or otherwise distract them from carrying out their duties. *Cf. United States v. Kizart*, 967 F.3d 693, 698 (7th Cir. 2020) ("[Arrestee's] reaction and behavior, his abrupt change from 'relieved' to 'shocked' or 'concern,' and his delay and failure to respond, all were key to [officer's] probable cause determination."). Taken in its totality, Defendants argue that this evidence was more than sufficient to support a finding of probable cause to arrest Mr. Kovacic for possession with intent to distribute marijuana and to seize the hemp which they believed to be marijuana.

Plaintiffs dispute that Sergeant Wilson detected an odor of burnt marijuana coming from Mr. Kovacic or their car, noting that on the body cam recording, he is heard saying only that he

smelled weed, which is indistinguishable from the smell of hemp. But Plaintiffs' primary argument is predicated on changes in the law that occurred after *Bentley* and many of the other cases on which the defendant officers rely. They note that the Agricultural Improvement Act of 2018 altered the definition of the term "marijuana" under the Controlled Substance Act to exclude hemp grown pursuant to the 2018 Farm Bill Act. 21 U.S.C. § 802(16)(B)(i). Hemp is excluded from the definition of marijuana so long as its concentration of Delta-9 THC is ≤ 0.3% of the product's dry weight. 21 U.S.C. § 802(16)(B); 7 U.S.C. § 1639o(1). Plaintiffs argue that given this change in the law and the additional information that was conveyed to the defendant officers at the time of the stop, they lacked probable cause to believe that Mr. Kovacic had committed a crime or that the plant-like substance found in their trunk was marijuana. Plaintiffs' argument also appears to have some merit.

In particular, Plaintiffs note that a dog trained to alert on marijuana will also alert on legal hemp, that marijuana and legal hemp have an indistinguishable odor, and that a Nark II test cannot differentiate between legal hemp and marijuana as it is only designed to detect the presence of THC, of which legal hemp still contains minimal amounts. *See* Dkt. No. 86 at 71, 76. Plaintiffs further argue that they repeatedly explained to the officers that they were hemp farmers and had a hemp producer license issued by the U.S. Department of Agriculture. Plaintiffs note that the USDA then and currently has a website containing a search function where the public, including law enforcement, can search hemp grower and processor licenses. Dkt. No. 109 at 2.

Plaintiffs also point out that the hemp was packaged with "fit for compliance" certificates issued by the Wisconsin Department of Agriculture, Trade, and Consumer Protection (DATCP), which regulated the production, handling, and transportation of hemp in the State of Wisconsin. *Id.* at 3. The DATCP's emergency regulation, which expired on January 31, 2022, required that

14

all lots of hemp be sampled prior to harvest and that the DATCP issue a "fit for commerce" certificate following a successful test showing the THC concentration is at 0.3 percent or below. Wis. Admin. Code § ATCP 22.13(1). The regulation provided that "[a]ll licensed growers shall obtain a fit for commerce certificate from the department for each lot prior to the hemp being transported from the growing location." *Id.* Licensed hemp growers and producers were not to transport hemp without first obtaining a "fit for commerce" certification and were required to have a copy of their license and a "fit for commerce" certificate in their possession for each lot being transported. Wis. Admin. Code § ATCP 22.14.

This case is readily distinguishable from those cases on which Defendants rely in support of their argument that no constitutional violations occurred. First, most of the cases they cite were decided before hemp was legalized, and so the issue never arose. *Bentley*, for example, a case Defendants cite for the proposition that an alert by a trained drug detection dog is by itself sufficient to support a finding of probable cause to search, was decided in 2015, three years before the Agricultural Improvement Act was passed and hemp was legalized. 795 F.3d at 635. And as for those cases decided after hemp was legalized, the issue raised was whether there was probable cause to search, whereas in this case the issue is whether there was probable cause to arrest an individual and seize property. Finally, in none of the cases Defendants cite did the occupants of the vehicle searched admit they were hemp producers and the substance found in the search turn out to be hemp with "fit for commerce" certificates affixed to the packages containing it.

In *United States v. Locke*, for example, a trained drug detection dog alerted on the defendant's car after he was stopped in connection with an ongoing drug trafficking investigation. *United States of America v. Locke*, No. 22-CR-133, 2024 WL 1343120 (E.D. Wis. Mar. 28, 2024). In the course of the search that followed, approximately two kilograms of cocaine was discovered

in a hidden compartment. In denying the defendant's motion to suppress the cocaine, Judge Adelman rejected the defendant's argument that a trained drug detection dog's inability to distinguish between marijuana and hemp rendered the dog's alert on his car unreliable and thus insufficient to support a finding of probable cause to search. Citing an unpublished decision by the Tenth Circuit in which the search led to the discovery of an illegally possessed firearm, Judge Adelman noted that the defendant's argument "fails to grapple with the nature of a probable cause determination." *Id.* at *5 (citing *United States v. Deluca*, No. 20-8075, 2022 WL 3451394 (10th Cir. Aug. 18, 2022)). Rejecting a similar argument in *Deluca*, in which the search resulted in the discovery of an illegally possessed firearm, the Tenth Circuit explained:

> It is undisputed that [drug-detecting canine] Maverick was trained to alert on marijuana, heroin, methamphetamine, and cocaine. If hemp was added to this list of four controlled substances, Maverick's alert on a car would still give rise to a high probability that a controlled substance is in the car as four of the five substances that Maverick could detect are illegal. Thus, we find that the officers had probable cause to search the car regardless of whether Maverick was trained to alert on legal hemp.

2022 WL 3451394, at *5. Unlike this case, however, the evidence seized in *Locke* and *Deluca* was not hemp to which was affixed "fit for commerce" certificates issued by a state agency. Aside from the challenge to the search, there was no claim that the defendants' arrests were unlawful since the items found in the search were obvious contraband. Nor did either defendant claim they were licensed hemp producers or have in their possession documentation showing that suspected marijuana was in fact hemp.

Likewise in the Western District of Wisconsin, Judge Conley adopted the magistrate judge's recommendation rejecting the defendant's argument that the fact that a drug detection dog had not yet been trained off hemp rendered the dog's alert insufficient to support a finding of probable cause. *United States v. Plancarte*, No. 22-cr-64-wmc, 2023 WL 3944888, *aff'd*, 105 F.4th 996 (7th Cir. 2024). In that case, in which the November 2022 search of a vehicle led to the

16

discovery of over ten pounds of methamphetamine, the magistrate judge noted, like the Tenth Circuit in *Deluca*, that even though the dog had not been trained off hemp, its alert on the car would still give rise to a high probability that a controlled substance would be found in the car, since four out of the five substances the dog was trained to detect were illegal. *Id.* at *7. While acknowledging the defendant's argument that "the use of drug dogs in the age of legalized marijuana and hemp products must be reexamined," *id.* at *1, and that "[c]ircuit-level guidance is needed as to whether new lines need to be drawn, and if so, where to draw them," *id.* at *6, the magistrate judge noted that "until this happens, no police department would have good reason to conclude that the legalization of hemp and some THC products requires them to completely stop using dogs trained on marijuana." *Id.* Again, unlike this case, the defendant in *Plancarte* never claimed he was lawfully transporting hemp or provided supporting documentation. And also, unlike this case, the validity of the search, not the arrest, was at issue.

*Harris v. Melchor*, like this case, was a civil rights action seeking damages for the allegedly unconstitutional search and seizure of the plaintiff following a traffic stop. No. 24-2468, 2025 WL 972467 (7th Cir. Apr. 1, 2025). The officer who stopped the plaintiff for a routine traffic violation thought he smelled marijuana when the plaintiff rolled down his window. In the course of the search that followed, the officer found what appeared to be marijuana (but turned out to be hemp), cash, and a handgun. Upon discovery of the handgun, the officer handcuffed the plaintiff and placed him in the back of his squad car. Shortly thereafter, the officer learned over police radio that the plaintiff had a valid permit and a Concealed Carry License, at which point he was promptly released. The plaintiff nevertheless sued the officer, claiming the officer had unlawfully seized him and searched his car. *Id.* at *1. The Seventh Circuit affirmed the district court's order granting the defendant's motion for summary judgment in an unpublished opinion, holding that regardless

of whether the officer smelled marijuana or hemp, "the smell of what [the officer] believed to be marijuana supplied probable cause for him to direct [plaintiff] to step out of the car for a search . . . even if that belief turned out to be mistaken. *Id.* at *4. Unlike this case, however, the plaintiff in *Harris* offered no official documentation showing that he was licensed to grow hemp and transport it over the highways. And, also, unlike this case, the officer did not arrest the plaintiff and seize his property.

Defendants argue that once probable cause was established by the discovery of what appeared to be marijuana and they obtained a positive result on the Nark II Duquenois Levine Reagent field test, they had no obligation to investigate further or search for exculpatory evidence before placing Mr. Kovacic under arrest and seizing the evidence. *See Burritt v. Ditlefsen*, 807 F.3d 239, 251 (7th Cir. 2015) ("Law enforcement is not required to discover more information to undermine probable cause once it has been established." (citing *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004))). Nor are law enforcement officers required to conclusively rule out a suspect's innocent explanation for incriminating evidence. *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018) (noting that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"). But the evidence that Plaintiffs were lawfully transporting hemp was not hidden away such that it needed to be uncovered. Mr. Kovacic told the officers they were licensed hemp growers shortly after the stop, and "fit for commerce" certificates issued by the DATCP were affixed to the packages containing the hemp. Police may not shut their eyes to exculpatory information in assessing whether the totality of the circumstances establish probable cause. *Guzell v. Hiller*, 223 F.3d 518, 520 (7th Cir. 2000) ("Police must act reasonably on the basis of what they know, and if what they know is more than an isolated sentence in a police report they can't close their eyes to the additional information.").

18

Based on the evidence before the court, Plaintiffs argue that a reasonable jury could find that the officers did not have probable cause to arrest Mr. Kovacic and seize the hemp. Plaintiffs never denied they were transporting hemp, and they told police that they were licensed hemp farmers, which they could confirm by checking the USDA website. Moreover, affixed to the bags of hemp found in the car were "fit for commerce" certificates issued by the DATCP under its emergency regulations showing that the substance had been tested at or below 0.3% total delta-9 tetrahydrocannabinol, indicating it was legal hemp. While Defendants contend that Mr. Kovacic's demeanor and behavior suggested he was involved in criminal conduct, a reasonable jury could conclude that he was merely expressing frustration with being pulled over on a rainy day for excessive tint on his car's windows.

On the other hand, while Plaintiffs may have been licensed hemp producers and the two bags and container of plant material may have had "fit for commerce" certificates affixed to them, the officers expressed doubt as to whether the substance was in fact hemp. They noted that the sealed packages did not appear to have been packaged commercially. Instead, the plant material was in zip-lock baggies similar to typical home kitchen food saver bags. There was also loose plant material in an unsealed baggie that was found in a disposable Glad Ware-type plastic container. The "fit for commerce" certificates were dated August 13, 2021, some nine months earlier.

Thinking that the date on the certificates indicated the date of packaging, Lieutenant Robinson thought they could not apply to the plant material to which they were affixed since it seemed too fresh and green in color to be that old. But it is clear from the regulations that "fit for commerce" certificates are issued upon testing of the hemp, which occurs before harvesting. Wis. Admin. Code § ATCP 22.13. It is only after the hemp is harvested, packaged, and prepared for

19

transport that the certificate must be affixed. § ATCP 22.14. Plaintiffs also offer evidence that packaged hemp remains fresh, green, and free from mold for extended periods, even exceeding a year after packaging. Still, the fact that the "fit for commerce" certificates were not affixed by government officials at the time of packaging leaves open the possibility that the certificates could be used to disguise the true identity of the plant-like substance being transported.

That is precisely what the individual defendants believed Plaintiffs might be doing in this case. Based on his training and experience, Lieutenant Thomson knew that individuals who transport marijuana sometimes disguise the marijuana as a legal product. Dkt. No. 97, ¶ 13. He also thought the certificates appeared different than those the officers had seen before. But instead of investigating further by calling the DATCP number on the "fit for commerce" certificates, or checking the USDA website, the decision was made to arrest Mr. Kovacic and seize the plant-like substance. Taking all of the evidence into consideration, the question of whether there was probable cause for Mr. Kovacic's arrest and seizure of the hemp cannot be decided by the court as a matter of law. There is a factual dispute over whether Sergeant Wilson smelled burnt marijuana emanating from the vehicle and from Mr. Kovacic's person, and there is a sharp difference of opinion concerning the reasonable inferences to be drawn from the facts. *Maxwell*, 998 F.2d at 434. On this record, the court is unable to say that no reasonable jury could find that probable cause for the arrest and seizure was absent.

It does not follow, however, that all eight of the individual defendants who were present at the time of the arrest are responsible for any violation that may have occurred. It is undisputed that while Crandon Police Officer Ashbeck placed Mr. Kovacic in handcuffs and escorted him to the rear of a squad car, Oconto County Sheriff's Office Lieutenant Thomson and Deputy School made the ultimate decision to arrest Mr. Kovacic and seize the items removed from Plaintiffs'

20

vehicle. Dkt. No. 113, ¶ 78. The other six individual defendants are alleged to have violated Plaintiffs' constitutional rights by failing to intervene and prevent Lieutenant Thomson and Deputy School from arresting Mr. Kovacic and seizing Ms. Kovacic's hemp. While there are circumstances under which a law enforcement officer's failure to intervene in another officer's violation of an individual's constitutional rights may render him or her culpable under § 1983, those circumstances were not present here.

More than simply being present is needed to support a claim for failure to intervene. An officer who is present and fails to intervene to prevent another other law enforcement officer from infringing the constitutional rights of an individual may himself be liable under § 1983 if (1) the officer had reason to know that a constitutional violation by a law enforcement officer was taking place and (2) the officer had a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citing *Byrd v. Brishke*, 466 F.2d 6, 10 (7th Cir. 1972)). A mere disagreement with another officer over an arguable probable cause determination, however, is not enough to give rise to a duty to intervene.

In *Yang*, for example, Brown, a police officer investigating a burglary of a shoe store, was observed leaving the store after placing some merchandise under his jacket. When the owner confronted him, Brown initially denied taking the merchandise but eventually took a pair of shorts out from under his jacket and threw them at the store owner. Hardin, Brown's partner, stood by and took no action throughout the confrontation and continued to take no action when the store owner tried to stop Brown from leaving by holding onto the driver's side door of his squad. With Hardin sitting in the passenger seat, Brown tried to dislodge the store owner by driving away recklessly in a zig-zagging pattern, braking and accelerating, and repeatedly elbowing the store owner in the ribs. When the car finally stopped, Brown got out and punched the store owner in

21

the face, knocking him to the ground as the store owner's brother arrived at the scene. Brown also knocked the store owner's brother to the ground. Not only did Hardin fail to call a sergeant or attempt in any way to stop Brown, but as the brothers lay in the street, he got out of the car, drew his gun, and shouted obscenities at them before the two officers got back in their car and drove away. *Id.* at 283–84.

Here, there is no reason to believe any of the officers who allegedly failed to intervene knew a constitutional violation was taking place. Even if a jury later finds that probable cause was lacking, the question is sufficiently close that it would be unreasonable to expect or require other officers to intervene and prevent Lieutenant Thomson, a superior officer, and Deputy School from carrying out their intent. The job of a law enforcement officer is difficult enough without adding to their duties the obligation to challenge their superiors and fellow officers every time a questionable probable cause determination is made in their presence. Accordingly, summary judgment is granted in favor of Sergeant Wilson and Deputy Christensen of the Oconto County Sheriff's Office, Lieutenant Robinson and Deputies Crum and Short of the Forest County Sheriff's Department, and Officer Ashbeck of the City of Crandon Police Department.

### c. Qualified Immunity and Indemnification

Defendants argue, in the alternative, that Plaintiffs' Fourth Amendment claims against the individual defendants must be dismissed because the officers are immune from civil liability for any constitutional violation that may have occurred. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from civil liability for constitutional violations "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). "Qualified immunity attaches when an official's conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (*per curiam*) (internal quotation marks and citation omitted). The doctrine reflects an accommodation between the public interest in safeguarding constitutional guarantees on the one hand, and on the other, the concern that subjecting government officials to personal liability and harassing litigation would inhibit them in the performance of their duties. *Id.*

Although qualified immunity is an affirmative defense to a § 1983 action, once raised, the plaintiff has the burden to overcome it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). The plaintiff must show both "(1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713 (citations omitted). While a plaintiff is not required to present a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and has reversed federal courts in qualified immunity cases where the lower courts "wrongly subject individual officers to liability." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 & n.3 (2015) (internal quotation marks and citation omitted). The Court has explained:

> An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.

*Id.* (internal quotation marks and citation omitted).

In other words, the court must determine whether a constitutional rule applies with such obvious clarity that it placed the officers in this case on notice that their conduct was unlawful. Plaintiffs assert that the right to be free from arrest and seizure without probable cause was indisputably established by the time of the incident. But that general principle is not in dispute. What was not clear at the time was whether the totality of the circumstances the individual defendants faced in this type of case were insufficient to support a finding of probable cause to believe Plaintiffs were involved in criminal conduct.

For qualified immunity to shield an officer from civil liability for unlawful arrest or seizure of property, "an officer needs only 'arguable' probable cause." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). "Arguable probable cause exists when a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id.* (cleaned up). In this case, probable cause was at least arguable. Mr. Kovacic's behavior was hardly that of a law-abiding hemp farmer simply going about his business as a commercial enterprise. While subject to other interpretations, it was not unreasonable for the officers to view his profanity and threats to sue as misdirection or intimidation tactics. The loose manner in which the plant-like substance was packaged likewise seemed inconsistent with a commercial enterprise. Moreover, no "fit for commerce" certificate was affixed to the four hand-rolled joints found in the prescription bottle in the center console of the car, and the very presence of the joints seemed inconsistent with Mr. Kovacic's statement that he did not smoke hemp. Also found in the car were a hand-rolled cigarette with a filter attached, two containers used to store cannabis, a pack of cigarette rolling papers, and an improvised device for smoking marijuana, all of which was also inconsistent with Mr. Kovacic's claim that he did not

24

smoke hemp. These facts, together with the facts that the plant-like substance taken from one of the joints tested positive for THC and that Mr. Kovacic had "open cases" against him, led the individual defendants to believe there was probable cause to place Mr. Kovacic under arrest for possession of marijuana with intent to distribute and seize what they believed to be marijuana.

The fact that the arresting officers turned out to be mistaken does not mean that at least arguable probable cause did not exist at the time of the arrest and seizure. "The probable-cause standard inherently allows room for reasonable mistakes . . . ." *Abbott*, 705 F.3d at 714. And "although it requires something more than a hunch, probable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Id.* (citations omitted). For the reasons stated above, the court concludes that the individual defendants' belief that the hemp was marijuana and that Mr. Kovacic was committing the crime of possession with the intent to distribute was at least arguable.

Plaintiffs have not identified, and the court has not found, a controlling case or robust collection of persuasive authority analogous to the set of facts presented here that clearly establishes the individual defendants' conduct violated Plaintiffs' constitutional rights. Indeed, Plaintiffs concede that "the standard for probable cause determinations in cases involving suspected marijuana crimes will have to change to account for the legalization of CBD and hemp-derivative products." Dkt. No. 114 at 8. But it appears that change had not yet occurred, or at least been conveyed to the individual defendants, at the time of Mr. Kovacic's arrest. Because there was at least arguable probable cause and Plaintiffs have failed to identify controlling precedent that "squarely governs the specific facts at issue," *Kisela*, 584 U.S. at 100, the individual defendants are entitled to qualified immunity. And since the individual defendants are immune

25

from liability, Plaintiffs' state law indemnification claims against the governmental employers also fail.

2.      **Monell Claims**

Plaintiffs also allege that Forest County, Oconto County, and the City of Crandon are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failing to train their respective officers on how to distinguish between hemp and marijuana. However, "there can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citation omitted). Only a county or municipality whose employees have violated the constitutional rights of another can be liable under *Monell*. Because the court has concluded as a matter of law that no constitutional violations were committed by the employees of Forest County and the City of Crandon, Plaintiffs' *Monell* claims against those defendants fail as well. That leaves only Oconto County.

Plaintiffs allege that Oconto County is liable under *Monell* for failing to train its respective officers on how to distinguish between hemp and marijuana. *Monell* held that while local governments are not strictly liable for the constitutional violations of their employees under the doctrine of *respondeat superior*, they can be held liable for damages under § 1983 for violations of federal rights that occur "pursuant to official municipal policy of some nature." 436 U.S. at 691. Although the court has determined that Lieutenant Thomson and Deputy School are personally immune from liability, in the event a jury concludes that Plaintiffs' Fourth Amendment rights were violated, Oconto County could be liable if the violation was caused by the County's action or inaction.

Municipal liability under § 1983 is not easily established, however. It requires an act or a failure to act that is "attributable to the municipality [that] itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694). In this respect, the bar is high and to establish municipal liability under § 1983, a plaintiff must generally show that an "express policy (e.g., policy statement, regulation, or officially adopted decision), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality" was the direct cause of the alleged constitutional deprivation. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) (cleaned up).

Here, Plaintiffs do not claim that Oconto County had a formal or informal policy that was a direct cause of the alleged constitutional deprivation. Instead, Plaintiffs contend it was the absence of a policy and/or adequate training that caused the violation. In cases alleging governmental liability based on inaction in the form of the absence of a policy or the failure to train, "the path to *Monell* liability based on inaction is steeper." *Id.* at 378. This is "because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *Id.* "For these reasons, '[w]here a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.'" *Id.* (quoting *Bryan County*, 520 U.S. at 405).

"[A] failure to act amounts to municipal action for *Monell* purposes only if the County has notice that its program will cause constitutional violations." *Id.* at 379. Such notice can be inferred if there is evidence of a prior pattern of similar violations. *Id.* at 380. Plaintiffs have offered no

27

such evidence of a pattern here. They do not claim that Oconto County law enforcement officers had a history of falsely arresting hemp producers. But notice can also be inferred if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that a factfinder could find deliberate indifference to the need for training. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* As the court explained in *Polk County*, "a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." 960 F.3d at 380. That is what Plaintiffs claim here.

Plaintiffs point to the legalization of hemp with the enactment of the 2018 Farm Bill on December 20, 2018. They note that in March 2019, the Wisconsin Attorney General released a legal memorandum on behalf of the Wisconsin Department of Justice to Wisconsin law enforcement agencies providing advice with respect to establishing probable cause under the changed circumstances. Dkt. No. 107 at 13–17. The memorandum specifically warned law enforcement officers of the difficulty of distinguishing between marijuana, which remains illegal in the State, and hemp, which is not:

> To be clear, law enforcement must not ignore facts suggesting that a substance is in fact legal industrial hemp and not illegal marijuana. In all situations, the probable cause determination hinges on the totality of the circumstances. If there are facts suggesting that a substance may be industrial hemp, law enforcement should conduct further investigation before deciding that there is probable cause to believe that the substance is marijuana.

*Id.* at 16. The memorandum listed a number of relevant considerations law enforcement officers should use in deciding whether probable cause may exist, including whether the person found in

possession claims the substance is hemp, has a license to produce hemp, and has a "fit for commerce" certificate attesting that the hemp had been tested for THC concentration.  *Id.*

Plaintiffs also point to an April 2020 publication by Sandy Koresch from the Wisconsin State Crime Laboratory (WSCL) entitled "Hemp or Marijuana: A New Tool for Law Enforcement."  The publication alerted law enforcement to a new field test to determine whether a suspected substance was marijuana or hemp.  *Id.* at 18.  The publication explained that hemp and marijuana cannot be distinguished by appearance, odor, or the Duquenois-Levine Reagent test, commonly used by law enforcement.  At the same time, the publication reported that a new field test known as the 4-AP test (also known as the Cannabis Typification test) was available to assist law enforcement with making the proper determination.  The memorandum also states, however, that more investigation was needed and the 4-AP test had not yet been incorporated into its own analytical scheme.

Also before the court is the report of Daniel Delmore, Plaintiffs' expert on police practices and training.  Dkt. No. 86 at 32–113.  Mr. Delmore, who worked in law enforcement for some twenty-seven years, including in drug investigation and enforcement, and has been an instructor at various technical colleges for law enforcement officers, describes several field tests that were available as early as 2020 to distinguish between hemp and marijuana.  *Id.* at 32–34, 76–78.  He also identifies various training programs that were offered to assist law enforcement in dealing with the changes in the law legalizing hemp.  *Id.*  Mr. Delmore offers the following opinion in his report:

> When policymakers know that their law enforcement officers perform discretionary actions such as stopping a citizen in a vehicle for a specific violation, and conduct their investigation, the need to adequately train officers in the constitutional limitations regarding such is also obvious and the failure to do so amounts to deliberate indifference.  In other words, the lead law enforcement executive has an

29

obligation to train his/her staff to foreseeable circumstances an officer may face while doing things they are supposed to do.

*Id.* at 56. Mr. Delmore further opines that "the Oconto County Sheriff's Department clearly had knowledge that the hemp laws had changed and should have implemented training and policy that took into consideration this change, especially for officers tasked with drug interdiction. Had the County done so, he states, the arrest of Mr. Kovacic and the seizure of Ms. Kovacic's hemp would not have occurred. *Id.* at 82.

From this evidence, a reasonable jury could find that Oconto County had prior notice of the changes in the law and the difficulties that were sure to arise as a result, yet failed to implement training and policies needed to address them. A reasonable jury could also conclude that the failure on the part of the governmental employers to adopt the policies and provide the training needed to avoid such mistakes reflected a deliberate indifference to the risk of false arrest and mistaken seizure of property. Summary judgment is therefore denied as to Plaintiffs' *Monell* claims against Oconto County.

**B.     Motion for Sanctions**

The Oconto and Forest County Defendants (collectively "the County defendants") have also filed a motion for sanctions pursuant to Federal Rule of Civil Procedure 11. These defendants assert that Plaintiffs should be sanctioned because Mr. Kovacic's claim that he was subjected to unconstitutional conditions of confinement during the three-day period he was confined in the Oconto County Jail, as well as Ms. Kovacic's due process claim, were frivolous and had no basis in fact or in law. The defendants request reasonable attorney's fees and costs for defending against these claims.

Rule 11 provides that an attorney who presents a pleading to the court, "whether by signing, filing, submitting, or later advocating it," certifies that

30

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The purpose of Rule 11 is to discourage baseless filings and to "streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). "The application of Rule 11 to the facts and circumstances of a particular case is an exercise of the trial court's discretion." *Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1028 (7th Cir. 1999) (citation omitted). In determining whether sanctions are warranted, "the court must undertake an objective inquiry into whether the party or his counsel should have known that his position is groundless." *Cuna Mut. Ins. Soc. v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) (cleaned up). The Seventh Circuit has cautioned that "a court must take care not to penalize arguments for legal evolution," *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1082 (7th Cir. 1987), and that "Rule 11 cannot be allowed to thoroughly undermine zealous advocacy," *Kraemer v. Grant County*, 892 F.2d 686, 690 (7th Cir. 1990).

Some procedural history is needed to place the County defendants' argument in context. This action was originally filed on May 22, 2023, by Attorney Shawn Barnett of the Chicago law firm Hale & Monico, LLC. The complaint asserted claims for false arrest, unconstitutional seizure of property, unconstitutional conditions of confinement, illegal strip search, and unreasonable detention without a prompt probable cause hearing. Dkt. No. 1. On July 13, 2023, Attorney Jason

Marx of the same law firm entered an appearance on Plaintiffs' behalf. Dkt. No. 3. In August 2023, multiple motions to dismiss for failure to state a claim under Rule 12(b)(6) were filed. Dkt. No. 6. On August 29, 2023, the County defendants served Plaintiffs, through their counsel, with a safe harbor letter pursuant to Fed. R. Civ. P. 11(c)(2) and a draft motion for sanction and exhibits. Dkt. No. 116-1. The County defendants argued that all of the claims asserted in the lawsuit were frivolous and specifically stated there was no basis in law or fact for Mr. Kovacic's unconstitutional medical care claim and Ms. Kovacic's procedural due process claim. The following day, Attorney Marx moved to withdraw on behalf of himself, Attorney Barnett, and the Hale & Monico firm, based on irreconcilable differences after the defendants had filed motions to dismiss. Dkt. No. 16.

Plaintiffs were unable to find replacement counsel to represent them, and eventually, after giving them time to do so, the court decided the motions to dismiss without a response, granting them in part. Given the change in the law that legalized hemp and the inability to distinguish between marijuana and lawfully grown hemp by smell, appearance, or the field test used by the officers, the court concluded that a more developed record was needed in order to rule on the Fourth and Fourteenth Amendment claims against the arresting and seizing officers. Dkt. No. 20 at 6–7 (noting that "hemp containing less than .3% THC has now been legal for more than five years. At some point, one would expect that law enforcement agencies would provide some sort of training to officers to alert them to the problem and implement safeguards to avoid arresting innocent individuals involved in a lawful enterprise. It is not clear at this stage of the litigation that the defendant enforcement officers in this case have not received such training or education as to what steps, if any, should be taken to avoid wrongful arrests."). Other courts had raised similar concerns. *See, e.g.*, *State v. Moore*, 2023 WI 50, ¶ 33, 408 Wis. 2d 16, 991 N.W.2d 412

(2023) (Dallet, J., dissenting) (noting that "if experts are correct that there is no distinction between the odor of legal hemp products and marijuana, then a central premise of *Secrist* is called into question and further undermines probable cause"). The court also denied the Oconto defendants' motion to dismiss Mr. Kovacic's Fourth Amendment conditions of confinement claim based on Mr. Kovacic's allegations that the defendants working at the jail had failed to provide him prescription medication for his heart and a soft food diet, both of which he claimed were medically necessary. *Id.* at 10; Dkt. No. 1, ¶¶ 32–34.

Following the court's decision granting in part and denying in part the defendants' motions to dismiss, Plaintiffs filed an amended complaint on March 14, 2024. Dkt. No. 29. In addition to reasserting their claims for unconstitutional arrest and seizure of property, and restating the allegations concerning the denial of his medically necessary prescription medication and soft-food diet, Plaintiffs alleged in their first amended complaint that "Plaintiff Kevin Kovacic required emergency medical attention at . . . Aurora Healthcare Oshkosh, immediately upon his release from custody. Kovacic was severely dehydrated and had lost several pounds while in custody." *Id.* ¶ 48. The County defendants then filed a motion for partial dismissal, and Plaintiffs filed a motion for leave to file a second amended complaint. Dkt. No. 32. While those motions were pending, Attorneys Emil Ovbiagele and Samantha H. Baker, the attorneys currently of record, entered appearances on Plaintiffs' behalf. Dkt. Nos. 65–66.

With Plaintiffs now represented by new counsel, the court granted their pending motion to file a second amended complaint and terminated the remaining pending motions as moot. Dkt. No. 67. On August 1, 2024, the second amended complaint was filed. Dkt. No. 68. The second amended complaint removed some of the claims Plaintiffs had included in their pro se first amended complaint but restated the allegations that Mr. Kovacic had been denied prescription

medication for an injury to his heart and a medically necessary soft-food diet, and that he had required emergency medical treatment upon his release from custody in support of Count Two. *Id.* ¶¶ 42–45. The second amended complaint also included, as Count Three, Ms. Kovacic's claim that the seizure of her hemp was in violation of both her Fourth Amendment right against unreasonable seizure of property and her Fourteenth Amendment right to due process of law. *Id.* ¶¶ 64–75. It is for the continued pursuit of those claims that the County defendants seek sanctions under Rule 11(c). They contend that the allegations of fact supporting Mr. Kovacic's claim for unconstitutional conditions of confinement were entirely without evidentiary support and that Ms. Kovacic's due process claim concerning recovery of her hemp was clearly deficient under existing law. Dkt. No. 115 at 4, 6.

In response, Plaintiffs argue, as a threshold matter, that their current attorneys were never served with the safe harbor letter Rule 11(c)(2) requires. They note that the County defendants served their original attorneys by email and that those attorneys thereafter withdrew. It was after their original attorneys' withdrawal that the court entered its decision granting in part and denying in part Defendants motions to dismiss, two amended complaints were filed, and Plaintiffs' current counsel entered the case. No new safe harbor letter was apparently served on them. As a result, Plaintiffs argue that the County defendants' motion for sanctions is procedurally flawed.

The County defendants argue in reply that substantial compliance with Rule 11(c)(2) is sufficient under the law of this circuit. Dkt. No. 122 at 2–3 (citing *McGreal v. Vill. of Orland Park*, 928 F.3d 556, 559 (7th Cir. 2019)). They further contend that because Plaintiffs' original attorneys were served with their safe harbor letter directed to the original complaint, it is sufficient notice to their current counsel as to the defects in the second amended complaint. In support of their argument, the County defendants note that the same defects were carried through in each

34

complaint. The fact that Plaintiffs changed attorneys, they argue, did not require that they reissue their safe harbor letter.

The County defendants' argument is persuasive. The two claims for which they seek sanctions were included in the original complaint and restated without change in both the amended complaint and the second amended complaint. They were not "withdrawn or appropriately corrected within 21 days after service [of the safe harbor letter] or within another time the court sets." Fed. R. Civ. P. 11(c)(2). Plaintiffs gave no indication of an intent to withdraw them until their response to the County defendants' motion for summary judgment. The fact that the original complaint was amended does not render a properly served safe harbor letter ineffective when the amended complaint restates the challenged claims verbatim. Nor does the change in attorneys. *See Bakker v. Grutman*, 942 F.2d 236, 240 (4th Cir. 1991) ("Rule 11 imposes upon substitute counsel a duty to investigate the legal and factual sufficiency of the claims he or she takes up."). Neither Plaintiffs nor their current counsel deny that they received the County defendants' safe harbor letter. They do not claim lack of notice. For these reasons, the court is satisfied that compliance with Rule 11(c)(2) has been shown and will proceed to address the County defendants' motion for sanctions on the merits.

On the merits, the County defendants contend that Mr. Kovacic's claim that he was unconstitutionally denied prescription medication for his heart condition and a medically required soft-food diet is wholly without factual support. They note that they explained in their draft motion for sanctions that was served on Plaintiffs on August 29, 2023, that the medical records from the Oconto County Jail showed that he was not denied any medications for a heart condition and that he was under medical supervision the entire three days he was in custody at the jail due to concerns

over his methadone withdrawal.  The County defendants contend that the absence of any factual support for Mr. Kovacic's claim became even more apparent through discovery.

In the course of his deposition, Mr. Kovacic admitted that none of the medications prescribed for him at the time he was in custody were for a heart condition.  Dkt. No. 101 at 39:04–08.  Although he had suffered a stab wound to his heart in 2016, the injury had been surgically repaired.  Contrary to the allegations in his second amended complaint, Mr. Kovacic denied that he was taking medication for his heart or that he had told anyone at the jail that he needed to take medication for his heart.  *Id.* at 40:03–06.

At his deposition, however, Mr. Kovacic testified that the medication he was not given was Ondansetron, which is used to treat nausea and control vomiting.  Although the medication is not for a heart condition, Mr. Kovacic testified that the need for the medication was brought on by his heart surgery.  He testified, "I can't eat without those pills."  *Id.* at 39:13.  Mr. Kovacic testified that although he received some of his medications while in custody, he did not receive Ondansetron, which was the "most important one."  *Id.* at 41:03.  As for his soft-food diet, Mr. Kovacic testified that he told everyone he saw at the jail that he could not eat solid food, but they did nothing.  *Id.* at 41:17–24.

The County defendants are correct to the extent their argument is that this is an exceptionally weak factual basis for a claim of unconstitutional denial of medical care over a three-day period of time in custody.  The jail records indicate that Mr. Kovacic was given his prescribed medications, including Ondansetron.  A different medication was awaiting verification at the time he was released, but he does not claim that medication caused him harm.  Dkt. No. 92, ¶¶ 20–24.  The jail administrator also reports that there was no record of Mr. Kovacic requesting a soft-food diet and no medical provider confirmed that Mr. Kovacic had a medical requirement for a soft-

36

food diet. *Id.* ¶¶ 19, 25. But the fact that the jail records conflict with Mr. Kovacic's version of events shows a factual dispute; it does not show his claim is frivolous. It is not unreasonable to question whether Mr. Kovacic's version of his medical condition was accurate and especially whether, as he alleged, he "required emergency medical attention at . . . Aurora Healthcare Oshkosh, immediately upon his release from custody." Dkt. No. 68, ¶ 45. Yet, his wife recounts that when she picked him up at the jail on Monday, he was "real sick" and she had to take him to the hospital. Dkt. No. 102 at 31:01–10. The County defendants apparently did not follow up with Aurora Healthcare to substantiate, or refute, this allegation. And while his claim would be doubtful even assuming it is accurate, the court is unable to say it is frivolous, especially given the "objective reasonableness" standard that recent cases have adopted for pretrial detainees. *See Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 569 (7th Cir. 2024) ("In these [pretrial detainee] cases, once a defendant deliberately acts, their awareness of the risk of harm, or lack thereof, goes only to objective reasonableness."). The fact that Plaintiffs abandoned Mr. Kovacic's conditions of confinement claim does not mean it was factually frivolous such that Rule 11(c) sanctions are appropriate. While it is important to discourage baseless filings, overly aggressive utilization of Rule 11(c) is unlikely to streamline the administration and procedure of the federal courts if a party's voluntary abandonment of weak claims is viewed as a basis for imposing such sanctions. Absent more, the court is unable to say the claim violates Rule 11(b).

As for Ms. Kovacic's due process claim, the County defendants argue that it had no legal basis. They note that the United State Supreme Court has held that the deprivation of property by a governmental employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Noting that in some cases, courts have

held that a motion for return of property seized by law enforcement officers pursuant to Wis. Stat. § 968.20 has been found a meaningful post-deprivation remedy, the County defendants argue Plaintiffs' assertion of a due process claim for the loss of her hemp was legally frivolous.

On the facts of this case, however, it is not clear that a motion for return of property under § 968.20 would have been a meaningful post-deprivation remedy. Until the hemp was tested, law enforcement considered the hemp contraband or evidence of a crime. By the admission of its own officers, Oconto County had no means of testing the hemp, requiring the County to find a private lab to perform the testing needed to determine whether or not it was contraband. By the time the analysis was complete, the hemp was allegedly worthless, which at least raises the question of whether the available post-deprivation remedy was meaningful. Again, on this record, the court is unable to say as a matter of law that Plaintiffs' due process claim was legally frivolous. It should also be noted that the claim that the hemp was seized without due process was part of Count Three, which remains as a *Monell* claim against the County. It was not stated as a separate claim.

To be sure, Plaintiffs did cast their net far wider than was warranted in naming so many individuals as defendants. The sheer number of individuals named as defendants on Count Two suggests that a "shoot first; ask questions later" approach was used. There was no reason some of the named defendants were not dismissed prior to summary judgment. But the County defendants' safe harbor letter challenged the merits of all of the claims in the complaint; it did not argue that the named defendants lacked personal involvement. In short, while the County defendants' desire to recover at least a part of their attorney's fees is understandable, the court is unable to find a basis for taking such drastic action under Rule 11. The motion is therefore denied.

38

## CONCLUSION

For these reasons, the motion for summary judgment by the City of Crandon and Officer Steve Ashbeck (Dkt. No. 81) is **GRANTED** and all claims against them are dismissed. The motion of the Oconto County and Forest County Defendants for summary judgment (Dkt. No. 87) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted as to all defendants except Oconto County. With the exception of the *Monell* claims against Oconto County, all claims against the individual defendants and Forest County are dismissed. Defendants' motion for sanctions (Dkt. No. 115) is **DENIED**. The *Monell* claim against Oconto County remains for trial.

**SO ORDERED** at Green Bay, Wisconsin this 23rd day of September, 2025.

William C. Griesbach
United States District Judge

39